**No. 24-1058**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

HUSSEIN NAJI, Personal Representative of the Estate of Ali Naji,

Plaintiff-Appellant,

v.

CITY OF DEABORN, MI and CORPORAL TIMOTHY CLIVE,

Defendants-Appellees.

On Appeal from the United States District Court
for the Eastern District of Michigan
Case No. 4:23-cv-10521; Hon. F. Kay Behm

**<u>BRIEF OF APPELLEES</u>**
**<u>CITY OF DEARBORN, MI AND CORPORAL TIMOTHY CLIVE</u>**

AUGUST LAW, PLLC

Gary K. August (P48730)
Michael C. Lewis (P59139)
Attorneys for Appellees
363 W. Big Beaver Road, # 410
Troy, MI 48084
248-833-6225

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Neither the City of Dearborn, MI, nor Corporal Timothy Clive are subsidiaries or affiliates of a publicly owned corporation.  No publicly owned corporation, not a party to this appeal, has a financial interest in the outcome of this litigation.  6 Cir. R. 26.1(a).

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................................. i

TABLE OF CONTENTS ...................................................................................... ii

STATEMENT OPPOSING ORAL ARGUMENT....................................................... vi

STATEMENT OF ISSUES ....................................................................................1

STATEMENT OF THE CASE...................................................................................2

A.    Facts ......................................................................................................2

B.    Procedural History ..............................................................................6

SUMMARY OF THE ARGUMENT .........................................................................9

ARGUMENT .....................................................................................................10

I.    The District Court Should Be Affirmed ..........................................10

    A.    Appellant Has No Viable Theory of Liability .....................................10

        1.  *Fourth Amendment*...................................................................10

        2.  *Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978)*.....................14

        3.  *Assault and Battery* ................................................................15

        4.  *Gross Negligence* ...................................................................16

    B.    Appellant, Nevertheless, Attempts to Manufacture Factual Disputes 18

        1.  *Naji's Alleged Mental Illness*...................................................18

        2.  *De-Escalation*........................................................................21

        3.  *The Protective Glass* ..............................................................22

        4.  *The Number of Shots*..............................................................23

CONCLUSION ..................................................................................................26

CERTIFICATE OF COMPLIANCE ......................................................................27

CERTIFICATE OF SERVICE ..............................................................................28

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS................29

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. al-Kidd*,
   563 U.S. 731 (2011)....................................................................................11

*Blackmore v. Kalamazoo County*,
   390 F.3d 890 (6th Cir. 2004)......................................................................15

*Bletz v. Gribble*,
   641 F.3d 743 (6th Cir. 2011).......................................................................17

*Boyd v. Baeppler*,
   215 F.3d 594 (6th Cir. 2000)................................................................ 25, 26

*Burgess v. Fischer*,
   735 F.3d 462 (6th Cir. 2013).......................................................................11

*Crawford v. Tilley*,
   15 F.4th 752 (6th Cir. 2021).......................................................................14

*Cunningham v. Shelby County, Tennessee*,
   994 F.3d 761 (6th Cir. 2021)............................................................ 10, 25, 26

*Gaddis v. Redford Twp.*,
   364 F.3d 763 (6th Cir. 2004) ........................................................... 20, 24, 26

*Graham v. Connor*,
   490 U.S. 386 (1989).......................................................................... 12, 13, 26

*Harlow v. Fitzgerald*,
   457 U.S. 800 (1982)....................................................................................10

*Hunter v. Bryant*,
   502 U.S. 224 (1991)....................................................................................11

*Latits v. Phillips*,
   298 Mich. App. 109 (2012).........................................................................17

*Malley v. Briggs*,
   475 U.S. 335 (1986)....................................................................................11

*Martin v. City of Broadview Heights*,
   712 F.3d 951 (6th Cir. 2013)..............................................................11, 22, 23

*Monell v. Dep't of Soc. Servs.*,
   436 U.S. 658 (1978)..................................................... vii, 5, 9, 15, 19, 21

*Mullins v. Cyranek*,
   805 F.3d 760 (6th Cir. 2015).......................................................................11

*Odom v. Wayne County*,
   482 Mich. 459 (2008) .......................................................................... 15, 17

iii

*Palma v. Johns*,
  27 F.4th 419 (6th Cir. 2022)........................................................................20
*Pearson v. Callahan*,
  555 U.S. 223 (2009)................................................................................10, 11
*Plumhoff v. Rickard*,
  572 U.S. 765 (2014)......................................................................................26
*Puskas v. Delaware County*,
  56 F.4th 1088 (6th Cir. 2019 )................................................................ 20, 22
*Richards v. City of Jackson*,
  788 F. App'x 324 (6th Cir. 2019)........................................................... 17, 18
*Roell v. Hamilton County*,
  870 F.3d 471 (6th Cir. 2017)..............................................................11, 20, 22
*Saucier v. Katz*,
  533 U.S. 194 (2001)......................................................................................10
*Scott v. Harris*,
  550 U.S. 372 (2007)......................................................................................10
*Stevens-Rucker v. City of Columbus*,
  739 F. App'x. 834 (6th Cir. 2018)........................................................... 25, 26
*T.S. v. Doe*,
  742 F.3d 632 (6th Cir. 2014)........................................................................11
*Tennessee v. Garner*,
  471 U.S. 1 (1985)..................................................................................... 12, 14
*Van Vorous v. Burmeister*,
  262 Mich. App. 467 (2004)...........................................................................17
*Watkins v. City of Battle Creek*,
  273 F.3d 682 (6th Cir. 2002).........................................................................15
*Williams v. City of Chattanooga,*
  772 F. App'x. 277 (6th Cir. 2019)........................................................... 25, 26

## Statutes

28 U.S.C. § 1912 ......................................................................................v, 27
28 U.S.C. § 1927 ......................................................................................v, 27
MCL § 15.231 ...............................................................................................5
MCL § 37.110 ...............................................................................................5

## Rules

FRAP 34(a)(2)..................................................................................................v

FRAP 34(a)(2)(A) ......................................................................................v
FRAP 38 ....................................................................................................v
FRCP 12(c) ........................................................................................ 16, 18
FRCP 15(a)(1)(A) ....................................................................................6
FRCP 15(A)(1)(b) ....................................................................................6
FRCP 56 ..................................................................................................16

## **STATEMENT OPPOSING ORAL ARGUMENT**

Oral argument should be prohibited because: (a) this appeal is frivolous; (b) the dispositive issues have been authoritatively decided; and/or (c) the decisional process will not be significantly aided by oral argument. FRAP 34(a)(2). This excessive force case arises out of an incident on December 18, 2022, when Appellant's decedent Ali Naji attempted to shoot and kill City of Dearborn police officer Timothy Clive. The entirety of this encounter was captured on high-quality videotape. As a result, Appellees immediately sought summary judgment on the basis of qualified immunity. In a well-researched, well-reasoned, 28-page opinion issued on December 29, 2023, the District Court agreed with Appellees, granted their motion, and dismissed the First Amended Complaint in its entirety.

For the reasons explained herein, this appeal is frivolous, so oral argument should be prohibited pursuant to Rule 34(a)(2)(A).[1] Further, the standards governing excessive force cases (and related theories of liability) are so well engrained in American jurisprudence that it is almost impossible to conceive of the Court having trouble applying them to the undisputed video footage of this encounter. The likelihood that oral argument will actually help the Court, therefore, is negligible, probably even nil. As a consequence, it should be forgone.

---

[1] Contemporaneous with this Brief, Appellees filed a motion for sanctions pursuant to FRAP 38, 28 U.S.C. § 1927, and/or 28 U.S.C. § 1912.

## STATEMENT OF ISSUES

1. Is this appeal frivolous?

2. Was the District Court correct when it dismissed the First Amended Complaint in its entirety?

3. Was the District Court correct when it concluded that Corporal Timothy's Clive's conduct was objectively reasonable under the Fourth Amendment?

4. Was the District Court correct when it concluded that the lack of an underlying Fourth Amendment violation precludes a claim premised upon *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978)?

5. Was the District Court correct when it concluded that no claim for assault and battery is cognizable under Michigan law?

6. Was the District Court correct when it concluded that no claim for gross negligence is cognizable under Michigan law?

Appellees answer all questions in the affirmative.

1

**STATEMENT OF THE CASE**

**A.     Facts**

This appeal arises out of a tragedy that occurred in the lobby of the City of Dearborn Police Headquarters on Sunday, December 18, 2022, at 3:32 p.m. when Corporal Timothy Clive ("Clive"), then a 14-year veteran of the Dearborn Police Department, was forced to shoot and kill Plaintiff's decedent, 33-year-old Ali Naji ("Naji").  Because this incident occurred in the police station's lobby, it was captured on multiple surveillance cameras, five in all: (a) the "Lobby Desk" camera, mounted above the front desk; (b) the "Lobby Doors" camera, mounted above the public entrance; (c) the "Lobby Elevator" camera, mounted to the right of the front desk, above the lobby's elevator; (d) the "Lobby Waiting" camera, mounted to the left of the front desk in the lobby's waiting room area; and (e) the "Front Circle" camera, mounted outside the police station, above its circle driveway.

Collectively, the five cameras yielded 58 minutes of footage, though nearly all the footage is irrelevant because it depicts the shooting's aftermath.[2]  The case centers on the Lobby Elevator footage at 3:32:38-3:33:02 because this section of

---

[2] All the video footage was filed via the District Court's media file upload under docket # 15-1 and identified as follows: Exhibit B1 – "Lobby Desk;" Exhibit B2 – "Lobby Doors;" Exhibit B3 – "Lobby Elevator;" Exhibit B4 – "Lobby Waiting;" and Exhibit B5 – "Front Circle."  The Court should note that no portion of the Front Circle footage was cited in the District Court (nor is it cited herein); the Front Circle footage was filed only to compile a complete record.

footage clearly depicts the movements of both men.  Video Footage, RE 15-1, Exhibit B3, Lobby Elevator, 3:32:38-3:33:02.  The Court should note that the Lobby Elevator footage does not contain audio (nor does the Lobby Waiting footage or the Front Circle footage), whereas the Lobby Desk footage and the Lobby Doors footage do contain audio.

There are six ways to enter the police station's lobby: (a) through the public entrance; (b) through a door on the right side of the front desk which steps down into the lobby; (c) through a more secure door to the right of and behind the front desk; (d) off the lobby's elevator, also to the right of the front desk; (e) through a door to the left of the front desk which leads from the records bureau; and (f) down into the lobby from the second floor via the lobby's stairwell.  Deposition Transcript, pp 92-93, RE 15-1, Page.ID 193.  The lobby, therefore, is accessible from multiple points of ingress.  The salience of this fact will become apparent as the Court reads on.

Though December 18, 2022, was a Sunday, the police station was busy because families were dropping off Christmas gifts to support the department's "No Child Without a Christmas Toy Drive."  Deposition Transcript, pp 89-91, RE 15-1, Page.ID 192-193.  Clive described the day as "one of the more busy Sundays I ever worked."  Deposition Transcript, p 91, RE 15-1, Page.ID 193.  As the incident began to unfold, Clive was at the "position-1 desk" in the rear of the station.  Deposition Transcript, pp 71-73, RE 15-1, Page.ID 188.  Between the other police officers on

3

duty plus the civilian staff, Clive estimated there were around eleven people working in the building at the time of the shooting.  Deposition Transcript, p 92, RE 15-1, Page.ID 193.

At 3:32:38 p.m., Naji walked into the lobby through the public entrance.  He was darkly dressed, wearing black pants, a black jacket, a black winter hat, and a COVID-style face mask.  Video Footage, Exhibit B3, Lobby Elevator, 3:32:38, RE 15-1.  Clive saw Naji enter the lobby via a closed-circuit television mounted near the position-1 desk.  Deposition Transcript, pp 73-74, RE 15-1, Page.ID 188-189. He then walked to the front desk and greeted Naji, asking him "How ya doin?" Deposition Transcript, pp 74-75, RE 15-1, Page.ID 189; Video Footage, Exhibit B1, Lobby Desk, 3:32:48, RE 15-1.

Without any warning whatsoever, Naji, using his right hand, removed a handgun from his rear waistband, pointed it at Clive, and pulled the trigger. Deposition Transcript, pp 93-94, RE 15-1, Page.ID 193-194; Video Footage, Exhibit B3, Lobby Elevator, 3:32:48 – 3:32:50, RE 15-1.  Chillingly, Clive heard the trigger go "click."  *Id.*  Naji's gun, however, had malfunctioned, so no bullet was fired.  Naji then attempted to correct the malfunction by reloading the magazine and pulling back on the weapon's slide so as to rack a bullet into the chamber.  Deposition Transcript, p 94, RE 15-1, Page.ID 194; Video Footage, Exhibit B3, Lobby Elevator, 3:32:51-3:32:55, RE 15-1.  Completely ambushed but wishing to alert his colleagues

4

of the emergency, Clive shouted "gun, gun, gun, . . ." Deposition Transcript, p 82, RE 15-1, Page.ID 191; Video Footage, Exhibit B1, Lobby Desk, and Exhibit B2, Lobby Doors, 3:32:51-3:32:55, RE 15-1. He then watched Naji reload the magazine and pull back on the weapon's slide, realizing, grimly, that Naji "was in the process of fixing a malfunction to kill myself or to kill anybody else that entered that lobby" through one of its six points of ingress. Deposition Transcript, pp 94-95, RE 15-1, Page.ID 194.

As a result, having no time to think and no choice but to act, Clive slid open the front desk window and fired seventeen shots in a continuous, 4-5 second volley. Deposition Transcript, pp 69, 81, 85-86, RE 15-1, Page.ID 187, 190-192; Video Footage, Exhibit B3, Lobby Elevator, 3:32:56-3:33:0, RE 15-1. Naji fell to the floor or dove to the floor early in the shot sequence. Clive, however, "never saw [Naji] drop the gun" though he did see him "rearing up onto his right side" like "he was still going to try to shoot and kill me." Deposition Transcript, pp 95-96, RE 15-1, Page.ID 194; Video Footage, Exhibit B3, Lobby Elevator, 3:32:57-3:33:00, RE 15-1. Consequently, Clive continued to fire until he "thought the threat was neutralized." Deposition Transcript, p 96, RE 15-1, Page.ID 194. It is unclear how many shots ultimately struck Naji, but it strongly appears that Clive's first shot - perhaps his first two shots – missed, and instead struck the window of the front vestibule, shattering it. Video Footage, Exhibit B2, Lobby Doors, 3:32:57, RE 15-

5

1. On the Lobby Waiting camera, Naji is seen losing control of the gun right around the same moment the window shatters.  Video Footage, Exhibit B4, Lobby Waiting, 3:32:57, RE 15-1.

From the moment Naji walked into the lobby to the moment Clive opened fire, only 18 seconds passed.  Video Footage, Exhibit B3, Lobby Elevator, 3:32:38-3:32:56, RE 15-1. These are the egregious facts on which Appellant and his attorneys base this utterly frivolous appeal.

## B.    Procedural History

Naji's Estate filed suit on March 3, 2023, alleging six theories of liability: (1) violation of the Fourth Amendment; (2) a constitutional violation pursuant to *Monell v Dep't of Social Servs*., 436 U.S. 658 (1978); (3) assault and battery under Michigan law; (4) gross negligence under Michigan law; (5) violation of the Michigan Persons With Disabilities Civil Rights Act ("MPDCA"), MCL § 37.110, *et seq*.; and (6) violation of the Michigan Freedom of Information Act ("MFOIA"), MCL § 15.231, *et seq*.[3]  Complaint, RE 1, Page.ID 1-21.  Notably, nowhere in the complaint did Appellant allege that Naji had tried to kill Clive *or even that he was armed*.

---

[3] When Appellees filed their motion for summary judgment, they sought dismissal of each of Appellant's claims including those brought under the MPDCA and the MFOIA. *See* Motion for Summary Judgment, RE 15, Page.ID 164-167.  When Appellant filed his response to Appellees' motion for summary judgment, however, he did not address the arguments Appellees made in opposition to the MPDCA and MFOIA claims.  As a result, the District Court concluded that Appellant had abandoned those claims, and it dismissed them

On March 16, 2023, before a portion the video footage was released to the public via You Tube, the City of Dearborn played the footage for Appellant and his attorneys. Motion for Summary Disposition, RE 15, Page.ID 150-151. The footage they saw was a 33 second split screen of the Lobby Desk and Lobby Elevator cameras. Despite seeing this footage, in the thirteen days before Appellees filed their original answer (on March 29, 2023), Appellant made no attempt to amend his complaint as authorized by FRCP 15(a)(1)(A). Then, after Appellees filed their original answer, Appellant made no attempt to amend his complaint in the 21-day period authorized by FRCP 15(A)(1)(b). On April 27, 2023, the District Court hosted a scheduling conference where the parties agreed that Appellant would have additional time to amend his complaint. Stipulated Order, RE 10, Page.ID 78-79. On May 8, 2023, Plaintiff filed a First Amended Complaint but, other than swapping out "John Doe" for "Corporal Timothy Clive" in the caption, the First Amended Complaint is identical to Appellant's original pleading. First Amended Complaint, RE 11, Page.ID 80-99.

So, after Appellant and his attorney saw the video footage, they had three chances to amend their complaint - before Appellees filed their answer, after Appellees filed their answer, and after the scheduling conference – yet they never

---

accordingly. Opinion, RE 21, Page.ID 351 (internal citations omitted). Neither claim is discussed in any substance in Appellant's brief, nor are they discussed in this response brief.

amended to plead facts consistent with the video evidence, namely that Naji was armed and that he had tried to shoot Clive. On the contrary, the First Amended Complaint ignores the video evidence altogether, alleging that: "Upon information and belief . . . [Clive] posed a deadly threat to [Naji's] physical safety *without a cause known to Plaintiff* as to why [Clive] deemed it appropriate to riddle the body of Naji with bullets . . ." First Amended Complaint, ¶ 21, RE 11, Page.ID 85 (italics added). Thus, Appellant had telegraphed his "strategy" of litigating this case as though the video footage simply does not exist.

Accordingly, during the scheduling conference on April 27, 2023, Appellees informed the District Court that they intended to file an immediate motion for summary judgment (and for judgment on the pleadings) based upon the unassailable video evidence. The District Court agreed to hold the entry of a scheduling order in abeyance pending its disposition of the motion, but it allowed Appellant to depose Clive in advance of the motion filing. Appellant deposed Clive on May 31, 2023. Appellees then filed their motion on June 26, 2023. Response and reply briefs were filed in due course, and, on December 20, 2023, oral argument was heard. On December 29, 2023, the District Court issued a decisive opinion granting Appellee's motion and dismissing the First Amended Complaint in its entirety. Order, RE 21, Page.ID 325-352.

This appeal followed.

8

## SUMMARY OF THE ARGUMENT

As the District Court made clear, on these facts, Appellant has no viable theory of liability. As to the federal constitutional claims, because Clive had no choice but to stop the lethal threat Naji embodied, his conduct was objectively reasonable under the Fourth Amendment. And because no violation of the Fourth Amendment occurred, as a matter of law, no claim premised upon *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978) is cognizable against the City of Dearborn.

As to the state law claims, because Clive acted in good faith, no claim for assault and battery is cognizable under Michigan law. And because Clive's conduct in stopping Naji was obviously intentional, as a matter of law, no claim for "gross negligence" is cognizable under Michigan law either.

The District Court's thoughtful opinion should be affirmed, and Appellant and his attorneys should be sanctioned for filing a frivolous appeal. Their assertions that Naji did not pose a threat, that Clive knew that Naji was mentally ill, and/or that Clive had time to de-escalate this emergency without resorting to deadly force are all objectively untrue as shown by the video footage and Clive's deposition testimony, both of which Appellant simply ignores.

9

## ARGUMENT

**I.    The District Court Should Be Affirmed**

**A.    Appellant Has No Viable Theory of Liability**

*1. Fourth Amendment*

In excessive force cases, "[w]hen videotape footage exists, the reviewing court need not credit the version of a party who asserts facts 'blatantly contradicted' by the videotape; rather [the court] should view the facts in the light depicted by the videotape." *Cunningham v. Shelby County, Tennessee*, 994 F.3d 761, 763 (6th Cir. 2021) (quoting *Scott v. Harris*, 550 U.S. 372, 380-81 (2007)).

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The doctrine is not merely a defense to liability; rather, when it applies, it protects government officials from lawsuits and the burdens of litigation. *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001). "Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officers from harassment, distraction and liability when they perform their duties reasonably." *Pearson, supra,* at 231. "When properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743

10

(2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The doctrine is broad enough to provide ample room for mistaken judgments. *Hunter v. Bryant*, 502 U.S. 224, 229 (1991). "In a civil suit arising from the use of deadly force, immunity should be recognized if officers of reasonable competence could disagree on the issue." *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015). Notably, in excessive force cases, the plaintiff bears the burden of proving that the police officer is not entitled to qualified immunity. *Roell v. Hamilton County*, 870 F.3d 471, 480 (6th Cir. 2017); *accord Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013).

When evaluating whether qualified immunity should be afforded to a police officer in an excessive force case, a court asks two questions: (1) whether the officer's conduct violated the Fourth Amendment; and (2) whether the Fourth Amendment right the officer allegedly violated was clearly established at the time of the incident. *Roell*, *supra*, at 480 (internal citations omitted). These questions may be answered in either order. *Pearson*, *supra*, at 236. If the plaintiff fails to establish either predicate, the officer is immune from suit. *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014); *accord Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013).

When considering the first question, whether the officer's conduct violated the Fourth Amendment, courts view the totality of the circumstances through an objective lens. *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). Three factors are

11

usually dispositive: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the officer's safety or to the safety of others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Id*. at 396. Whether a particular use of force is permissible is judged from the perspective of a reasonable officer on the scene, not in hindsight. *Id*. Importantly, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split second judgments - in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id*. at 396-97. "[W]here an officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

Here, the *Graham* factors overwhelmingly favor Clive. As to the first factor, the severity of the crime at issue, this case presents no less than the ambush and attempted murder of a police officer. The District Court found that "it was objectively reasonable for Clive to perceive that Naji, who was pointing the gun in his direction and attempting to fire it, intended to cause him bodily harm or to kill him." Opinion, RE 21, Page.ID 337. It concluded that "the seriousness of the crime factor weighs <u>strongly</u> in favor of finding that the use of deadly force was not excessive." *Id*. (underlined emphasis added).

12

As to the second factor, whether the suspect posed an immediate threat, it is manifest that Naji posed not only an immediate threat, but a lethal one, and not only to Clive, but to anyone who may have entered the lobby via one of its six points of ingress including the other police officers and civilian staffers in the building at the time of the shooting, and/or members of the public.  The District Court:

> . . . considering the totality of circumstances, the Court finds that Clive's use of deadly force was objectively reasonable and necessary to protect both Clive and other officers and staff onsite.  The Court also emphasizes the importance of Clive's actions to protect the public, given that a member of the public could have entered the police station lobby at any time on a busy Sunday during a Christmas toy drive while Naji was armed and actively trying to discharge his weapon.

Opinion, RE 21, Page.ID 345.[4] (underlined emphasis added).

The video speaks for itself so there is no point in belaboring the analysis. Clive's conduct was objectively reasonable under the Fourth Amendment.[5]

---

[4] Because of how the incident unfolded, the third *Graham* factor, resisting arrest or evading arrest by flight, is inapposite.  Naji wasn't resisting arrest or trying to flee; quite the contrary, he was trying to kill Clive.

[5] In addition to whether the officer's conduct was objectively reasonable under the Fourth Amendment, the second predicate a court considers when evaluating whether qualified immunity should be afforded to a police officer is whether the alleged right was "clearly established." Because the District Court concluded that Clive's conduct was objectively reasonable under the Fourth Amendment, it chose not to address the "clearly established" predicate. Opinion, RE 21, Page.ID 346.  The District Court's decision is fully consistent with case law. *See, e.g., Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021) (a court may address the qualified immunity predicates in either order; if one is lacking, the court need not address the other).  At page 21 (the Court's pagination) of his brief, however, Appellant argues that the District Court's decision to omit analysis of the "clearly established" predicate constitutes

### 2. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)

Claims brought under *Monell* allege constitutional violations by governmental entities that foster unconstitutional policies or practices. Here, Plaintiff alleges that the City of Dearborn has an unconstitutional policy or practice condoning the use of excessive force in its police department. A threshold requirement for any *Monell* claim, however, is an underlying constitutional violation. *See*, *e.g.*, *Blackmore v. Kalamazoo County*, 390 F.3d 890, 900 (6th Cir. 2004); *accord Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2002). For the reasons already explained above, Clive did not violate Naji's Fourth Amendment rights. As a result, no claim

---

reversible error. But Appellant cites no case holding that a district court that concludes that an officer's conduct was objectively reasonable under the Fourth Amendment must nevertheless also address whether the alleged right was clearly established. Indeed, as *Crawford* shows, no such analysis is necessary, so the argument is simply made up.

And assuming the District Court had chosen to address the "clearly established" predicate, undoubtedly it would have concluded that the right Appellant alleges was not clearly established at the time of the shooting. The upshot here is that Appellant must cite a case holding that a suspect in circumstances like those created by Naji has a right *not to be shot*. In the vast corpus of excessive force jurisprudence, however, no such finding has been made, and for obvious reasons. In fact, as this Court knows from the hundreds of excessive force appeals it has handled, longstanding precedent holds that when "an officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Tennessee v Garner*, 471 U.S. 1, 11 (1985). So, not only is Appellant wrong when he suggests that the District Court erred by not addressing the "clearly established" predicate, he is wrong to the extent he suggests that had the District Court addressed the predicate, it would have located in the case law a clearly established right that somehow exculpates Naji.

14

against the City of Dearborn is cognizable under *Monell*.

### 3. Assault and Battery

To establish immunity from an intentional tort under Michigan law, Clive must show: (1) that he acted in the course of his employment and within the scope of his authority; (2) that he acted in good faith or without malice; and (3) that his acts were discretionary. *Odom v. Wayne County*, 482 Mich. 459, 480 (2008). Unlike the qualified immunity standard, which is objective under federal law, the *Odom* good faith standard is subjective under Michigan law. *Id.* at 481-82 (the good faith standard "protects [an officer's] honest belief and good faith conduct with the cloak of immunity while exposing to liability [an officer] who acts with malicious intent."). As a result, the District Court concluded, correctly, that the immunity standard in state assault and battery cases is broader than the immunity standard in federal excessive force cases. Opinion, RE 21, Page.ID 349 ("'Michigan law affords greater protection than federal law.'") (internal citation omitted). From there, the District Court set up a simple syllogism: because Clive acted reasonably under the Fourth Amendment, *a fortiori*, he acted in good faith under *Odom* such that governmental immunity shields him from liability for assault and battery.

15

### *4. Gross Negligence*

This was a pleading failure under Rule 12(c).[6] Obviously, there was nothing negligent or grossly negligent about Clive's decision to fire. His doing so was neither accidental nor reckless. Rather, it was fully intentional, as Clive admits. Deposition Transcript, pp 67-68, RE 15-1, Page.ID 187. Michigan law does not permit plaintiffs to "transform claims involving intentional [acts] into claims for gross negligence." *Van Vorous v. Burmeister*, 262 Mich. App. 467, 483-84 (2004) (overruled in part on other grounds by *Odom*, *supra*, at n. 33); *accord Bletz v. Gribble*, 641 F.3d 743, 756 (6th Cir. 2011). Michigan law characterizes such attempts as "artful pleading" intended to circumvent *Odom*. *See Latits v. Phillips*, 298 Mich. App. 109, 120 (2012) ("Plaintiff's claim is one of intentional tort, and no amount of artful pleading can change that fact.").

In the District Court, Appellant attempted to mitigate the artfulness of his pleading by arguing (amorphously) that Clive violated "'certain procedures and statutory obligations'" such that the claim for gross negligence was severable from

---

[6] In addition to Rule 56, Appellees sought dismissal pursuant to Rule 12(c). *See* Motion for Summary Disposition, RE 15, Page.ID 149. In its Opinion, the District Court did not mention Rule 12(c), but clearly it agreed with the argument Appellees made on this issue. *See* Opinion, RE 21, Page.ID 350 ("... when a court is faced with claims of gross negligence, it must look 'beyond the procedural labels in the complaint and determine the exact nature of the claim' and '[e]lements of intentional torts may not be transformed into gross negligence claims.'" (internal citation omitted).

16

the shooting and therefore capable of surviving on its own merits. Motion for Summary Judgment Response Brief, RE 16, Page.ID 309 (internal citation omitted). The District Court rejected this argument, concluding that because Appellant's gross negligence claim was premised on the same facts as the assault and battery claim, "gross negligence" is not cognizable under Michigan law. Opinion, RE 21, Page.ID 350-351.

Here Plaintiff makes the same argument the District Court rejected: that Clive's decision to fire without first attempting to de-escalate amounts to gross negligence. Appellant's Brief, pp 38-40 (the Court's pagination). In support of his assertion, Appellant again cites *Richards v. City of Jackson*, 788 F. App'x 324 (6th Cir. 2019). In *Richards*, a police officer failed to secure a search warrant before he entered a private residence and shot a dog. Based upon the officer's failure to follow proper procedures by first securing a warrant before he entered the residence, this Court concluded that a gross negligence claim was cognizable under Michigan law because the claim "[was] sufficiently distinct from the separately pleaded intentional torts" arising from the shooting of the dog. *Id*. at 337.

But here no such distinction may be drawn because Clive was ambushed. This encounter unfolded in a matter of seconds so Clive's alleged gross negligence for failing to attempt to de-escalate cannot be separated from his intentional act of shooting Naji. Unlike in *Richards*, where a much clearer line can be drawn at the

17

officer's failure to secure a search warrant before entering the residence, here Clive's inability to de-escalate the encounter cannot be separated from the shooting because they occurred virtually simultaneously.  And it should be noted that Count IV of the First Amended Complaint (the gross negligence count) does not even mention de-escalation; it purports to state a claim exclusively on Clive's act of shooting Naji. First Amended Complaint, RE 11, Page.ID 94-95.  So, in a non-sequitur, Appellant argues that Clive owed Naji a duty of care.  But surely this is untrue: Clive did not owe a duty of care to a man who was trying to kill him.  The District Court properly dismissed (tacitly pursuant to Rule 12(c)) the "gross negligence" claim because it fails to state a claim under Michigan law.

In sum, each of Appellant's theories of liability – Fourth Amendment, *Monell*, assault and battery, and gross negligence – is completely devoid of merit.  The District Court's Opinion is unassailable to the point where Appellant simply could not have believed in good faith that this appeal stood any chance of resulting in reversal or remand.

### B.    Appellant, Nevertheless, Attempts to Manufacture Factual Disputes

#### 1.  Naji's Alleged Mental Illness

Throughout his brief, Appellant asserts that Naji was mentally ill.[7]   The First

---

[7] In fact, Appellant asserts that "Naji had received treatment for mental illness *which Appellees were aware of . . .*"  Appellant's Brief, p 10 (the Court's

18

Amended Complaint, however, fails to identify a specific mental illness and the record is devoid of any evidence to support the assertion that Naji was, in fact, mentally ill. That Appellant alludes to mental illness at all, however, shows the degree to which he is grasping at straws because for the argument to be relevant, Clive obviously had to know that Naji was mentally ill. But not surprisingly, when Naji entered the police station (wearing a mask, no less), Clive had no idea who he was. Deposition Transcript, p 95, RE 15-1, Page.ID 194. He saw Naji for only a few seconds before Naji tried to kill him so, other than deducing that Naji was armed and dangerous, Clive had no time to deduce anything else about him. He was simply a stranger trying to inflict harm.

And even if Clive knew that Naji was mentally ill, it would not have changed the calculus because police officers facing emergencies are not required to accommodate disabilities. *See*, *e.g*., *Gaddis v. Redford Twp.*, 364 F.3d 763 (6th Cir. 2004) (affirming dismissal on summary judgment where police officers shot a knife wielding, mentally disturbed suspect in a single volley of sixteen shots); *Roell*,

---

pagination) (italicized emphasis added). There is no evidence in the record to support this assertion. Other portions of Appellant's Brief are similarly inexplicable. For example, also on p 10, Appellant discusses the "Medical Examiner's Report" and even refers the Court to "p. 3" of that report. The problem is that no such report appears in the record. Then, on p 19, Appellant discusses Clive "[firing] his taser multiple times . . . without any warning." Yet, this case has nothing to do with a Taser. These errors are indicative of the kind of loose practice that often foreshadows a frivolous appeal.

*supra*, at 489 (affirming dismissal on qualified immunity grounds in a 1983/ADA case where a mentally ill suspect's requested accommodations were unreasonable in light of public safety concerns); *Puskas v. Delaware County*, 56 F.4th 1088, 1098 (6th Cir. 2019 ) (use of deadly force against a suspect alleged to have been mentally ill upheld because officers were responding to a "*live* crime scene, with a non-compliant, erratic, and most important, *armed* suspect.") (italics in original); *Palma v. Johns*, 27 F.4th 419, 436-37 (6th Cir. 2022) (a suspect's alleged mental illness is relevant only if the officer knows about it).

So, there is no evidence that Naji was mentally ill. But even if the Court assumes that he was mentally ill, and even if it further assumes that Clive deduced a mental illness the very moment he laid eyes on Naji, on dangerous facts like these, the conclusion is the same: mental illness does not matter.[8]

---

[8] The District Court found Appellant's "attempt to tie Naji's mental health to the Police Department's de-escalation policy . . . unavailing because there is no evidence in the record that Clive was aware that Naji suffered from any mental illness." Opinion, Re 21, Page.ID 342, n. 1. Appellant wishes to use Clive's alleged violation of the de-escalation policy as a gateway into a broader claim against the City of Dearborn premised upon *Monell*. This is why he mentions unrelated shooting incidents involving other City of Dearborn police officers. *See* Appellant's Brief, p 33. It is also why he mentions Clive's oversight in not filling out a Use of Force Report after the incident, and that Clive "never makes any verbal commands" before he fires his gun. *See* Appellant's Brief, pp 33, 39. Appellant hopes to throw all this together in a kind of mélange to bootstrap a claim that the City of Dearborn maintains an unconstitutional policy or practice condoning the use of excessive force by its police department. Appellant, however, does not know the first about the other shooting incidents except, of course, that they occurred at all. And it is difficult to discern the materiality of

20

### 2. De-Escalation

Clive could not de-escalate this encounter because "[t]here was not time, and [Naji] was in the process of fixing a malfunction to kill myself or anybody else that entered that lobby." Deposition Transcript, p 95, RE 15-1, Page.ID 194. There is no genuine issue of material fact on this issue. *Roell* and *Puskas* in particular support Appellees' assertion that the dire emergency Clive faced did not afford him any time to attempt de-escalation techniques.[9] Appellee's argument to the contrary willfully ignores the video evidence.

---

Clive's not filling out a Use of Force Report when this entire incident was captured on high quality videotape. In the aftermath of this tragedy, which left the entire police department shaken to its core, both Clive and his superiors simply overlooked the report. And as far as Clive's alleged refusal to give verbal commands before he fires his gun, Appellant is wrong for two reasons. First, the subject incident marks the first and only time Clive has fired his gun on duty, and second, the transcript of Clive's deposition contains an extended discussion of incidents in 2015 and 2017 where he used voice commands to de-escalate encounters involving armed individuals. Deposition Transcript, pp 28-62, 15-1, Page.ID 177-186. Thus, Appellant's insinuation that Clive shoots first and asks questions later is belied by the very deposition his attorney took. Notably, the 2017 incident involved two men armed with long guns (carried via shoulder straps) who entered the police station to make a political point about the Second Amendment (while livestreaming the event). Neither man ever raised his weapon much less pointed it at Clive or anyone else, but the point is that Clive controlled the entire encounter with voice commands. Appellees do not wish to make a meal of this issue because it isn't necessary: there is no underlying constitutional violation so there is no claim under *Monell*. Still, Appellees touch upon these issues to demonstrate just how specious Appellant's arguments truly are.

[9] Even Appellant admits that the incident unfolded in a "remarkably short timeframe." Appellant's Brief, p 21.

21

As Appellees pointed out at oral argument, when it comes to de-escalation, the cases (not surprisingly) turn on the nature of the encounter. Oral Argument Transcript, RE 26, Page.ID 375-376. Appellant cites as persuasive precedent *Martin v City of Broadview Heights*, 712 F.3d 951 (6th Cir. 2013), but *Martin* is immediately distinguishable because although the assailant in that case was behaving strangely, he was unarmed and non-threatening. Accordingly, this Court ruled that it was unreasonable for the arresting officers to resort to physical force without first attempting to de-escalate. Surely the Court's decision in *Martin* is correct, but here the case is inapposite because unlike the officers in *Martin*, Clive was confronted with an armed suspect who was trying to kill him.[10]

### 3. The Protective Glass

Yet, because Clive was behind the glass that enclosed the front desk, Appellant argues – ludicrously - that he had "ample" time to attempt to de-escalate and thereby refrain from using deadly force. Appellant's Brief, p 24 (the Court's pagination). It goes without saying that no matter where Clive was inside the building, he could not allow Naji to start shooting up the lobby. Not only would that have been a complete abdication of his sworn duty as a police officer, it would have put lives in danger because at any moment someone could have walked into the lobby unwittingly. The District Court noted that firing a gun at someone behind protective glass is calculated

---

[10] The officers in *Martin* also knew that the assailant was mentally ill.

22

to put life in danger, and certainly it is correct on this point. Opinion, RE 21, Page.ID 338. But there is more at stake here than just Clive's safety for if Appellant is correct, that is, if the law requires police officers to hunker down behind protective glass and shout de-escalation commands while armed suspects open fire in the middle of municipal buildings, public safety policing ceases to exist. Appellant's argument is *reductio ad absurdum* writ large, further underscoring the manifest weakness of this appeal.[11]

### 4. The Number of Shots

Clive fired seventeen shots in a continuous, 4-5 second volley.[12] Three facts are paramount: (1) Clive was ambushed; (2) Clive never saw Naji drop the gun; and (3) the video shows Naji attempting to roll onto his right side - the same side he had attempted to fire from.[13] Video Footage, Exhibit B3, Lobby Elevator, 3:32:57-3:33:00, RE 15-1. This is why Clive continued to fire - because he believed Naji was "still a threat . . . rearing up onto his right side, almost like he was getting – he was attempting to lay on his right side" like "he was still going to try to shoot and

---

[11] The District Court described the argument as a mere "notion" completely unsupported by case law. Opinion, RE-21, Page.ID 341-42.

[12] The District Court's Opinion discusses Clive "retriev[ing] his gun" before he opened fire. Opinion, RE-21, Page.ID 341. However, to the extent the Opinion suggests that Clive did not have his gun on his person when Naji walked into the lobby, it is inaccurate. Clive had his gun in a holster on his right hip.

[13] Considering how Naji fell, it would have been virtually impossible for Clive to perceive that he had lost control of the gun. Things were happening much too quickly for him to make an observation that precise.

23

kill me."  Deposition Transcript, p 96, RE 15-1, Page.ID 194.

Numerous cases support Clive's decision to fire seventeen shots in a continuous, 4-5 second volley.  *See*, *e.g., Gaddis, supra,* at 763 (affirming summary judgment where two officers shot a knife wielding, mentally disturbed suspect in a single volley of sixteen shots); *Williams v. City of Chattanooga,* 772 F. App'x. 277 (6th Cir. 2019) (affirming summary judgment where six officers fired a total of eight shots [separate volleys of two and six] at an assailant who had charged out of a home carrying a gun and a sword and who continued to shift his position on the ground after he was brought down by the first volley of shots) (*see* Motion for Summary Disposition, Exhibit C, RE 15-1, Page.ID 213-217); *Cunningham v. Shelby County*, 994 F.3d 761 (6th Cir. 2021) (reversing a denial of summary judgment for two officers who fired a total of ten shots at a suspect who, in an eleven second encounter, refused to drop what appeared to be a .45 caliber pistol); *Boyd v. Baeppler*, 215 F.3d 594, 603 (6th Cir. 2000) (reversing a denial of summary judgment where two officers, while pursuing a suspect on foot, fired a total of eleven shots, including seven shots after the assailant "lifted his torso [off the ground] and turned to point his weapon."); *Stevens-Rucker v. City of Columbus*, 739 F. App'x. 834, 844 (6th Cir. 2018) (police officer was immune from suit where he continued to fire as a knife-wielding suspect fell to the ground because a single volley of shots "within a second of one another . . . was not enough time for [the officer] to stop and reassess the

24

threat level . . . He continued to use his firearm to stop what he justifiably perceived as an immediate threat to his safety.") (*see* Motion for Summary Disposition, Exhibit D, RE 15-1, Page.ID 219-230). And in a case involving fifteen shots fired in two separate volleys, the Supreme Court reversed the denial of summary judgment in a high-speed chase case, recognizing that "if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014).

Every excessive force case is different though what they share in common is a close examination of the facts, which is why opinions in excessive force cases tend to be longer – courts lay out the facts very carefully. Despite the emergencies evident in *Gaddis, Williams, Cunningham, Boyd*, *Stevens-Rucker*, and *Plumhoff*, here the emergency was far more dire because Naji's ambush deprived Clive of any opportunity to get his bearings. Clive, after all, was not responding to a 911 call or making a traffic stop like the officers in those other cases. He had no frame of reference whatsoever, and therefore no reason to believe that his life was in danger when he performed the simple act of walking to the front desk to greet what appeared to be a routine visitor to the police station. This case epitomizes the reality that police officers are often forced to make "split second judgments - in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at 396-97. Clive did what

25

any good police officer would have done – he stopped the threat, and the number of shots he fired in the heat of the moment should give no fair observer pause.

## CONCLUSION

Friedrich Nietzsche famously wrote "There are no facts, only interpretations." Nietzsche's aphorism might make for an interesting discussion of postmodernist philosophy, but it is a terrible way to practice law.  Facts matter and here the facts are indisputable.  In voices stentorian, the District Court's outstanding Opinion should be affirmed, Appellees should be awarded prevailing party costs pursuant to Rule 39, and Appellant and his attorneys should be sanctioned for filing a frivolous appeal pursuant to Rule 38, 28 U.S.C. § 1927, and/or 28 U.S.C. § 1912.

Respectfully submitted,

AUGUST LAW, PLLC

By : _/s/ Michael C. Lewis_____
Gary K. August (48730)
Michael C. Lewis (P59139)
Attorneys for Appellees
363 W. Big Beaver Road, #410
Troy, MI 48084
(248) 833-6225
Dated: May 6, 2024                          mlewis@august-law.com

26

## CERTIFICATE OF COMPLIANCE

STATE OF MICHIGAN  )
                              ) SS.
COUNTY OF OAKLAND      )

MICHAEL C. LEWIS, being first duly sworn, certifies and states the following:

1. He is an attorney with the firm August Law, PLLC, and is in principal charge of the above-captioned cause for the purpose of preparing the attached brief on appeal;

2. The brief on appeal prepared by his office complies with the type-volume limitation;

3. August Law relies on the word count of their word processing system used to prepare the brief, using Cambria size 14 font; and

4. The word processing system counts the number of words in the brief as 6,660.

Dated:  May 6, 2024                    */s/Michael C. Lewis*
                                              MICHAEL C. LEWIS

## <u>CERTIFICATE OF SERVICE</u>

MICHAEL C. LEWIS, attorney with the law firm of AUGUST LAW, PLLC, being first duly sworn, deposes and says that on the 6th day of May, 2024, he caused a copy of this document to be served upon all parties of record, and that such service was made electronically upon each counsel of record so registered with the United States Court of Appeals for the Sixth Circuit, and via U.S. Mail to any counsel not registered to receive electronic copies from the court, by enclosing same in a sealed envelope with first class postage fully prepaid, addressed to the above, and depositing said envelope and its contents in a receptacle for the U.S. Mail.

AUGUST LAW, PLLC

By : _/s/ Michael C. Lewis_____
Gary K. August (48730)
Michael C. Lewis (P59139)
Attorneys for Appellees
363 W. Big Beaver Road, #410
Troy, MI 48084
(248) 833-6225
Dated: May 6, 2024                     mlewis@august-law.com

28

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| DESCRIPTION OF ENTRY NO. | RECORD ENTRY NO. | PAGE.ID |
|---|---|---|
| Complaint | 1 | 1-21 |
| Stipulated Order | 10 | 78-79 |
| First Amended Complaint | 11 | 80-99 |
| Motion for Summary Disposition | 15 | 131-168 |
|    Exhibit A – Deposition Transcript of Corporal Timothy Clive | 15-1 | 169-210 |
|    Exhibit B – Video Footage | | 211 |
|      Exh B1 – Lobby Desk | | |
|      Exh B2 – Lobby Doors | | |
|      Exh B3 – Lobby Elevator | | |
|      Exh B4 – Lobby Waiting | | |
|    Exhibit C – Unpublished Case – Williams v City of Chattanooga, TN | | 212-217 |
|    Exhibit D – Unpublished Case – Stevens-Rucker v City of Columbus, OH | | 218-230 |
|    Fact Appendix in Support of MSD | 15-2 | 231-235 |
|      Exhibit A – Deposition Transcript of Corporal Timothy Clive – Condensed | | 236-277 |
|      Exhibit B – Video Filed | | 278 |
| Motion for Summary Judgment Response Brief | 16 | 279-310 |
| Opinion and Order | 21 | 325-352 |
| Oral Argument Transcript | 26 | 359-405 |

29